UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MEGHAN CHRISTMAS, | ) | CIVIL NO. 3:17-CV-1568 (KAD) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUN LIFE ASSURANCE COMPANY | ) | |
| OF CANADA, | ) | |
| Defendant. | ) | December 13, 2018 |

MEMORANDUM OF DECISION RE:
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 12] AND
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS [ECF NO. 11]

**Statement of the Case**

The Plaintiff, Meghan Christmas, ("Plaintiff" or "Christmas") pursuant to the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §1001 et seq., challenges the denial of her claim for Long Term Disability ("LTD") benefits by the Defendant, Sun Life Assurance Company of Canada ("Defendant" or "Sun Life"). Before the Court are Christmas's motion for summary judgment and Sun Life's motion for judgment on the record, both of which the Parties have agreed should be treated as motions for a trial "on the papers." The Court has reviewed the parties' submissions, the administrative record, the applicable statutory scheme and controlling appellate authority on the issues presented. For the reasons that follow, Christmas's motion for summary judgment is DENIED, and Sun Life's motion for judgment on the pleadings is GRANTED.

**Factual and Procedural Background**

Christmas worked for ISGN Corporation ("ISGN") as a "Manager – Global Solutions Integration" until April 9, 2014. ISGN had a LTD benefits plan for its employees that is covered by the provisions of ERISA and insured by Sun Life (the "Plan"). ISGN is the Plan administrator,

1

but it delegated to Sun Life "its entire discretionary authority" to review and to decide claims for LTD benefits as follows:

> The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy. This discretionary authority includes, but is not limited to, the determination of eligibility for benefit, based upon enrollment information provided by the Policyholder, and the amount of a benefits due, and to construe the terms of this Policy.
>
> Any decision made by Sun Life in the exercise of this authority, including review of denials of benefit, is conclusive and binding on all parties. Any court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves that Sun Life's determinations are arbitrary and capricious.

In this case:

> **Total Disability or Totally Disabled** means during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation. . . . To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or combination of Days of Total and Partial Disability.

Christmas stopped working on April 9, 2014. She filed a claim for LTD benefits on June 3, 2014. Thereafter, Christmas submitted multiple medical records from multiple treatment providers in support of her claim, including the records of Dr. Christopher Skola, her rheumatologist, and Dr. Michael Karasik, her gastroenterologist. Ultimately, Sun Life denied Christmas's claim for LTD benefits on July 28, 2014. Christmas appealed the denial on December 31, 2014. During the appeal process, Sun Life engaged National Medical Review, Co. Ltd. ("NMR") to provide a records review by three physicians — D. Dennis Payne, M.D, Board Certified in Internal Medicine and Rheumatology; David Hoenig, M.D., Board Certified in Neurology and Pain Medicine; and Steven Channick, M.D., Board Certified in Internal Medicine. After reviewing the medical records provided by Christmas, each reviewing physician provided

2

an assessment of Christmas's medical conditions particular to his specialty. Based largely on these assessments, Sun Life determined that the denial of benefits was the appropriate decision and denied Christmas's appeal on March 3, 2015. This action was filed thereafter on September 20, 2017.

As noted above, Sun Life's motion is captioned a motion for "judgment on the record" while Christmas's motion is styled as a motion for summary judgment. "Sometimes in ERISA cases parties make a 'motion for judgment on the administrative record,' which we have observed is a motion that does not appear to be authorized in the Federal Rules of Civil Procedure. . . . If such a motion is treated as a summary judgment motion, the district court must limit its inquiry to determining whether questions of fact exist for trial. . . . In some circumstances, it may be appropriate for the district court to treat such a motion as requesting essentially a bench trial 'on the papers' with the District Court acting as the finder of fact. . . . In that scenario, the district court may make factual findings, but it must be clear that the parties consent to a bench trial on the parties' submissions, . . . and the district court must make explicit findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)." *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 642 F.3d 110, 116 (2d Cir. 2011) (citations omitted; internal quotation marks omitted). Here, the Parties have explicitly advised the Court, citing *O'Hara,* that they seek a trial "on the papers." Joint Report of Rule 26(f) Planning Meeting, ECF No. 9; Joint Status Report, ECF No. 22; Pls.' Mem. Supp. Summ. J., ECF No. 12-1.

**Standard of Review**

The Court must first determine the appropriate standard of review to be applied to Sun Life's determination to deny Christmas's claim for LTD benefits. Christmas contends that *de novo* review applies here, while Sun Life contends that an arbitrary and capricious standard applies.

"[ERISA] permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 108 (2008). "In 'determining the appropriate standard of review,' a court should be 'guided by principles of trust law'; in doing so, it should analogize a plan administrator to a trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (*i.e.*, an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." *Id.* 111 (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489, U.S. 101, 111–13 (1989)). Under principles of trust law, a plan administrator's denial of benefits will generally be reviewed *de novo,* unless the plan itself provides otherwise. *Id. See also, Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 82 (2d Cir. 2009) ("a administrator's decision to deny benefits is reviewed *de novo*" except "where, . . . written plan documents confer upon a plan administrator the discretionary authority to determine eligibility.")

However, where the plan documents give the plan administrator discretion to review and to decide benefit claims, a reviewing court will not disturb the plan administrator's decision denying benefits "unless it is arbitrary and capricious." *Hobson,* 574 F.3d at 82 (internal quotations omitted). Under this deferential level of review, a court will overturn an administrator's decision to deny benefits only where the decision "was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 83. Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by [the decisionmaker] . . . and requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir. 1995) (alterations in original). The scope of review is narrow, and this Court cannot substitute its own judgment for that of the plan administrator. *Hobson,* 574 F.3d at 83-84; *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir. 1995).

Here, the Parties agree that the Plan at issue gives the Plan administrator, ISGN, discretionary authority to review and to decide benefit eligibility for Plan enrollees. ISGN delegated its "entire discretionary authority" to review and to decide benefit eligibility to Sun Life. Thus, the arbitrary and capricious standard of review applies in this case.

Notwithstanding the foregoing, Christmas urges this Court to apply a *de novo* standard of review. She relies upon the fact that Sun Life was operating under a conflict of interest insofar as it was both deciding eligibility and funding benefits. Where an employer both funds a plan and determines eligibility thereunder, a clear conflict of interest exists. *Glenn,* 554 U.S. at 112. Similarly, a conflict exists where the plan administrator is not the employer but rather an insurance company selected both to review and decide claims and to pay them where an employee is found eligible. *Id.* at 114–15. Under these circumstances, however, the standard of review is not revisited. Rather, the conflict becomes one of the factors considered when applying the arbitrary and capricious standard of review. *Id.* 115–16. *See also McCauley v. First Unum Life Ins. Co* 551 F.3d 126, 133 (2d Cir. 2008) ("a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion but does not make *de novo* review appropriate"); *Hobson,* 574 F.3d at 82–83 (same).

Christmas also avers that *de novo* review is appropriate insofar as Sun Life did not comply with Department of Labor regulations that require a claim administrator "take into account all comments, documents, records, and other information submitted by the claimant related to the claim." 29 C.F.R. 2560.503-1(h)(2)(iv). *See Halo v. Yale Health Plan,* 819 F.3d 42, 57–58 (2d Cir. 2016) (holding that failure of plan administrator to adhere strictly to the labor regulations subjects the denial of coverage to *de novo* standard of review, even where the plan gives discretion

to the administrator). The factual predicate for this argument is that certain source statements submitted by Christmas's treating physicians, Dr. Skola and Dr. Karasik, were not provided to Sun Life's three reviewing physicians. A review of the record, however, belies this claim.

The records at issue are Dr. Karasik's "Crohn's Disease Source Statement," dated November 21, 2014, and Dr. Skola's "Physical Medical Source Statement," dated November 6, 2014. As indicated above, in evaluating Christmas's claim, Sun Life engaged three physicians — Dr. Payne, Dr. Hoenig, and Dr. Channick — to conduct an independent records review. Attached to each of these physicians' assessments, is a cover page indicating the "records provided for review." Each cover page lists records from Dr. Karasik dated from March 6, 2013 through January 21, 2015. Dr. Karasik's source statement falls squarely within this timeframe. Each cover page also lists records from Dr. Skola dated from February 7, 2014 through November 6, 2014. Dr. Skola's November 6, 2014 source statement falls within this timeframe as well. Indeed, Dr. Skola's source statement is the only document from Dr. Skola dated November 6, 2014. It is therefore the only possible record referenced by the reviewing physicians on their list of records provided for review.

Moreover, Dr. Channick and Dr. Hoenig specifically included the content of Dr. Karasik's source statement in their assessments, and Dr. Channick further included the content of Dr. Skola's source statement in his assessment. Because the record reflects that each of the reviewing physicians received the same materials, the Court infers that all three reviewing physicians received the statements at issue, even if they did not all include the content of each of those statements in their assessments. Christmas's reliance upon *Halo v. Yale Health Plan,* 819 F.3d 42 (2d Cir. 2016) as requiring *de novo* review is therefore misplaced. Sun Life's denial of benefits shall be reviewed under the arbitrary and capricious standard as set forth above.

6

**Discussion**

As noted throughout the records, between 2012 and 2015 Christmas was diagnosed at various times with gastrointestinal issues (including Crohn's disease, irritable bowel syndrome, and reflux), psoriasis, arthritis, back pain, joint pain, fatigue, and fibromyalgia. Sun Life's reviewing physicians each opined, within their respective specialty, that Christmas's medical records did not support a claim of disability as of April 9, 2014 or thereafter. In their assessments, the reviewing physicians each opined that there was no substantial change in Christmas's condition prior to or after April 9, 2014, that the objective findings in Christmas's medical records were not consistent with Christmas's subjective complaints, and that there was insufficient information to support the claimed diagnoses, disabilities, or limitations on Christmas's ability to work. On appeal, Christmas argues that Sun Life's reliance upon these assessments was arbitrary and capricious because the reviewing physicians did not adequately address in their assessments the opinions of Dr. Skola and Dr. Karasik concerning the nature and severity of her medical conditions.

"ERISA and the Secretary of Labor's regulations under the Act require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials. . . . But these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003). Although a plan administrator may not arbitrarily refuse to credit a claimant's reliable evidence, "courts have no warrant to require [plan] administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834 (footnote omitted); *Hobson,* 574 F.3d at 85. As discussed above, if there is substantial evidence in the record

to support the plan administrator's determination, that determination must stand. *Hobson,* 574 F.3d at 83–84.

The medical records supplied by Christmas in support of her claim included two statements from Dr. Skola dated June 6, 2014 and November 6, 2014 respectively. The June 2014 statement provided that she had psoriatic arthritis, right and left wrist synovical tenderness, bilateral hand stiffness, foot plantar fasciitis, and low back stiffness. For limitations, Dr. Skola indicated that Christmas could not stand or walk at all, could sit for only one to three hours a day, and could drive for only one to three hours a day. Although he indicated she could firmly grasp objects, he stated she was unable to perform "fine manipulating" and restricted her to lifting ten pounds. He further opined that she was "unable to work due to active psoriatic arthritis" and gave her a Class 5 rating for her physical impairment rendering her "incapable of minimum (sedentary) activity." Dr. Skola also opined regarding Christmas's mental impairment, indicating that she is "unable to engage in stress situations or engage in interpersonal relations (marked limitation)." He indicated that Christmas is unable to work within the limitations described in any capacity and that her limitations are permanent.

The November 2014 statement included diagnoses of "seronegative spondylitis arthritis related to Crohn's," carpal tunnel syndrome, "degenerative spondylosis, pars defect," and depression. Dr. Skola described Christmas's symptoms from her medical conditions as "widespread achiness, stiffness and pain" with "bilateral hand numbness." As to restrictions, he now limited Christmas to fifteen minutes of sitting and fifteen minutes of standing a day. He stated that she could sit, stand, or walk less than two hours in any eight-hour work day. He also restricted her to lifting rarely ten pounds and never lifting twenty or fifty pounds. He indicated she could never twist, stoop, crouch/squat, climb stairs, or climb ladders. He restricted the use of her hands

and fingers to 10 percent of an eight-hour work day and opined that she would be "off task" 25 percent or more of the time in an eight-hour work day. He estimated that she would have an absence from work for more than four days per month.

Dr. Karasik also submitted a "Crohn's Medical Source Statement." Therein, he included diagnoses of Crohn's disease, Primary Biliary Cerhossis, GERD, and psoriatic arthritis/psoriasis. He indicated that Christmas had constant daily abdominal and joint pain. Dr. Karasik did not suggest any physical limitations but stated that Christmas would have to take unscheduled restroom breaks during the working day, that she would need ready access to a restroom, and that she would be "off task" 25 percent or more of the time during an eight-hour work day. Notwithstanding the content of these submissions, each of the physicians who conducted an independent review of the entirety of Christmas's medical records reached contrary opinions. The propriety of each physician's assessment will be addressed in turn.

**Dr. Channick's Assessment**

Dr. Channick, who is a Board Certified in Internal Medicine, concluded that Christmas did not have "Crohn's as was previously thought." Instead, he concluded that she had irritable bowel syndrome and that she had this condition prior to and after April 9, 2014. Dr. Channick's conclusion is amply supported by the medical records he reviewed. Although given a tentative diagnosis of Crohn's disease by Dr. Karasik, that diagnosis was called into question by Christmas's other gastroenterologist, Dr. Frederick Heis in February 2014. Dr. Heis noted that Christmas's "wide array of symptoms" had no "clear diagnosis." He was "not convinced" she had Crohn's disease. He also observed that Christmas's "appeared to have a somatization syndrome" and he feared she was "over medicated." Two months later, in April 2014, Dr. Heis further reported:

> I reviewed all of her recent CT scans and her CT enterography with the radiologist this afternoon. There is nothing convincing to

> support the diagnosis of Crohn disease. The liver appears normal. The patient's laboratory tests were all normal except for mild elevation of the ALT. The antinuclear antibody is positive. All of her other studies are unremarkable. I told the patient she does not have Crohn disease. She does not appear to have primary biliary cirrhosis or any other significant liver problem.

In addition, Dr. Andrew Warner, a consulting gastroenterologist, saw Christmas one month later, on May 22, 2014. He observed that "the patient has had 2 colonoscopies with ileal examination, neither of which showed ulcerations, 2 sets of biopsies of the ileum that were nonspecific, and CT enterography that was normal. With these 5 data points, not demonstrative of Crohn's disease, I cannot support the diagnosis of Crohn's disease."

In addition to concluding that Christmas did not have Crohn's disease, Dr. Channick concluded that, from an internal medicine perspective, Christmas was physically able to perform full time sedentary work between her alleged onset date, April 9, 2014, and the date of the report. He also found "no restrictions needed for the work place other than free ability for bathroom breaks for her IBS symptoms" and that "there were no diagnoses that would cause fatigue that would prevent sedentary employment." The clinical findings contained in Christmas's medical records fully support these conclusions. Accordingly, it was not arbitrary or capricious for Sun Life to rely upon Dr. Channick's assessment in denying Christmas's claim.

**Dr. Hoenig's Assessment**

Dr. Hoenig conducted an independent records review within his area of expertise — neurology and pain medicine. Based upon his review of the records, he concluded, from a neurological perspective, that "there is no relevant neurological treatment history and any medically supported neurological diagnoses present during the period of April 14, 2014 to the [date of the report]. There is no documentation of neurological pathology. In addition, there is no documentation of neurological deficits on examination." Dr. Hoenig found no change in

Christmas's health and corresponding functional capacity between when she was working and her claimed onset date of April 9, 2014. As a result, Dr. Hoenig concluded that Christmas was not disabled or unable to perform full time sedentary work during the relevant time period; that her subjective complaints of pain or fatigue were not consistent with objective medical evidence; that there was no documentation of objective cognitive or concentration deficits on neurological examination; and that Christmas's condition does not "appear to be primarily neurological."

The medical record amply supports Dr. Hoenig's neurological assessment. As noted by Dr. Hoenig, a neurological examination was not done during the majority of Christmas's doctor visits. She did, however, have an MRI of her lumbar spine in February 2014 which showed a partially healed right pars defect, a moderate disc protrusion, a mild mass effect on the thecal sac, but there was no evidence of mass effect on adjacent nerve roots and the MRI was otherwise normal. Five days later, Christmas saw Dr. Howard Lantner, a neurosurgeon, for her ongoing back pain. He noted some tenderness upon palpitation and lower extremity pain. His examination also found, however, "painless passive range of motion to bilateral hips, 5/5 motor strength," "negative straight leg raises," the ability to ambulate "without difficulty," and "[n]o evidence of lower extremity myelopathy." Christmas saw Dr. Lantner again on June 12, 2014. His treatment notes reflect that Christmas had "full power in her lower extremities and ambulates without difficulty. She has no signs of myelopathy." Dr. Lantner determined she was not a candidate for surgery. Of note, on both occasions, Dr. Lantner's "assessment" of Christmas was that she had "intermittent" low back and lower extremities symptoms.

Finally, Christmas saw Dr. Sharon Katz, a rheumatologist, on April 22, 2014 for "an evaluation of generalized joint symptoms." Dr. Katz's exam revealed "[f]ull range of motion of the cervical spine. No tenderness with palpitation of the vertebral column. No sign of any active

synovitis." In light of these records, it was not arbitrary or capricious for Sun Life to rely on Dr. Hoenig's assessment.

### Dr. Payne's Assessment

Dr. Payne conducted an independent record review in his area of expertise, rheumatology. Dr. Payne noted:

> There is extensive work-up in the file from a rheumatology perspective including imaging of the hands, wrist, and elbows and these studies are all normal. She has evaluations by Dr. Scola, rheumatology, and her laboratory data are all completely normal other than a positive ANA 1:40. The examination data in the file from a rheumatology viewpoint never reveals changes of synovitis, weakness, or atrophy, and there are no deformities or damage.

He also noted that the partially healed L5 pars defect did not show changes that would impair Christmas's function. As a result, Dr. Payne concluded that there was no rheumatological condition which rendered Christmas unable to work or which would support significant limitations on her functional capacity. Dr. Payne's assessment is clearly at odds with Dr. Skola's June 2014 and November 2014 statements.

Christmas's medical records amply support Dr. Payne's conclusions. As noted by Dr. Payne in his assessment, Christmas's lab results do not support a rheumatological diagnosis, nor do her medical records. Christmas saw Dr. Skola on April 8, 2014, the day before her claimed onset date, at which time she complained of "constant" but "dull" pain in her hands. Dr. Skola ordered ultrasound imaging of Christmas's wrists on April 8, 2014, which had normal results. Specifically, the "synovium appeared normal" and the "median nerve was visualized and appeared normal with normal measurement of 11 mm2. The superficial and deep flexors were normal with no tenosynovial hypertrophy." On April 22, 2014, Dr. Katz, a consulting rheumatologist, examined Christmas, noting that she was in "no acute distress," and had a "good range of motion of all joints examined." With respect Christmas's "joint symptoms," Dr. Katz did not "see any

sign of active inflammation" and "[saw] no reason to resume prednisone." Shortly thereafter, Christmas saw Dr. Skola on two more occasions, approximately one month apart. At both visits, Christmas reported pain in her hands and back.[1] At both visits, however, Dr. Skola noted that Christmas appeared comfortable, had a full range of motion, and had "no deformity, no nodules and no swelling."[2]

In sum, Sun Life's reliance upon the three independent reviewing physicians' assessments when denying Christmas's claim for LTD benefits, was not arbitrary and capricious. Indeed, these assessments and the medical records that they were based upon provide well more than substantial evidence to support Sun Life's denial of benefits. *See Hobson,* 574 F.3d at 85 (holding that plan administrator "acted within its discretion in relying upon the conclusions of its independent consultants' three reports").

To the extent Christmas claims that the requirement of objective proof is not included as a requisite under the Plan and therefore cannot be a basis upon which benefits are denied, she is incorrect. "[I]t is not unreasonable for ERISA plan administrators to accord weight to objective evidence that claimant's medical ailments are debilitating in order to guard against fraudulent of unsupported claims of disability." *Hobson,* 574 at 88. Thus, Sun Life is entitled to require Plan participants to submit objective medical evidence to support a claim of total disability. *Id.*; *Gaud-Figueroa v. Metro. Life Ins. Co.,* 771 F. Supp. 2d 207, 216 (D. Conn. 2011).

Lastly, Christmas asserts that Sun Life should have requested an Independent Medical Examination ("IME") of her and that its failure to do so was arbitrary and capricious. As Christmas acknowledges, however, the Second Circuit has held that "requiring the plan administrator to order

---

[1] At the later visit, she further reported pain in her wrist and foot.
[2] Inexplicably, nine days after the second visit, Dr. Skola submitted the APS in which he described Christmas as permanently disabled and unable to work.

an IME, despite the absence of objective evidence supporting the applicant's claim for benefits, risks casting doubt upon, and inhibiting 'the commonplace practice of doctors arriving at professional opinions after reviewing medical files,' which reduces the 'financial burden of conducting repetitive tests and examinations.'" *Hobson,* 574 F.3d at 91 (quoting *Davis v. Unum Life Ins. Co.,* 444 F.3d 569, 577 (7th Cir. 2006)). Thus, in the absence of objective medical evidence to support a claimant's disability, the plan administrator is not required to request an IME and the failure to do so is not considered arbitrary and capricious. *Hobson,* 574 F.3d at 91. *See also Topolian v. Hartford Life Ins. Co.,* 945 F. Supp. 2d 294, 357 (E.D.N.Y. 2013). As discussed above, the objective evidence plainly supports Sun Life's conclusion that Christmas was not disabled.

For all of the foregoing reasons, the Plaintiff's titled motion for summary judgment is DENIED. The Defendant's titled motion for judgment on the pleadings is GRANTED.

Judgment shall enter in favor of the Defendant. The Clerk is directed to close this matter.

So Ordered, this 14th day of December, 2018.

_____/s/_____
Kari A. Dooley, USDJ